## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

**KRISTINA SAVTCHOUK f.k.a. KRISTINA POWELL,**

**Index No. 1:22-cv-0659**

**Plaintiff,**

**v.**

**COMPLAINT AND JURY DEMAND**

**CHERSTEV EAST THIRD LLC,**
**CHERYL BORKOWSKI,**
**HERTZ, CHERSON & ROSENTHAL, P.C.,**
**and SMITH, CARROAD, LEVY, WAN &**
**PARIKH, P.C.,**

**Defendants.**

-------------------------------------------------------------x

Plaintiff Kristina Savtchouk (formerly known as Kristina Powell), files suit against Defendants Hertz, Cherson & Rosenthal, P.C. ("Hertz") and Smith, Carroad, Levy, Wan & Parikh, P.C. ("Smith") for their violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et. sec.* (the "FDCPA") and against Defendants Hertz, Smith, Cherstev East Third LLC ("Cherstev"), and Cheryl Borkowski for their violations of New York General Business Law § 349 and committing gross negligence, alleges as follows:

### SUMMARY OF CLAIMS[1]

Housing instability is one of the greatest harms caused by domestic violence. When a woman is forced to leave their own home to be safe, the problems are grave and numerous – finding transitional housing or shelter to stay off the streets and affordable housing to regain a permanent residence are difficult when there is little to no notice that they will be ejected from their home. One consequence too rarely addressed is debt, which among many other sources can come from the rental arrears of the residence they have been forced out of. New York has created

---

[1] This summary is for the convenience of Defendants and the Court. The summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

laws to address this problem, most specifically Real Pro. Law § 277-c, which provides for the termination of a lease for survivors of domestic violence. And even common law principles like constructive eviction can be employed to prevent a survivor from having liability for the rent of a residence they no longer live in.

But despite these remedies, there are unscrupulous landlords and debt collectors who, rather than following court orders and exercising basic sympathy for people at the most difficult time of their lives, instead take advantage of the vulnerability and seek to get as much money as they can from the survivor. And that is what this case is about. Ms. Savtchouk was forced out of her apartment due to domestic violence in June 2019. After her abuser had her arrested under false pretenses in September of 2019, Ms. Savtchouk contact her landlord, Cherstev, to provide notice that she could no longer live at the apartment. Despite this Cherstev, by and through the collection law firm Hertz, filed a lawsuit on January 2, 2020 against Ms. Savtchouk, as well as her abuser Shawn Powell, for rental arrears of the apartment in October and November of 2019. The requisite rent demand notice was only served on December 5, 2019 on the apartment, which Defendants claimed was service of Ms. Savtchouk despite having been given notice that she had been forced to vacate the apartment in September of 2019. Ms. Savtchouk learned about the lawsuit by checking in the court records herself.

On March 4, 2020, there was a hearing in the First Collection Lawsuit where Ms. Savtchouk entered into a Settlement with Cherstev, which provided that: (1) Cherstev reserved the right to seek $7,888.32 from Ms. Savtchouk and conversely Ms. Savtchouk reserved all defenses to this alleged debt for rental arrears from October of 2019 to February 2020, and (2) Cherstev expressly released Ms. Savtchouk from any liability for rental arrears incurred after the date of the Settlement, March 4, 2020. While Ms. Savtchouk did not want to enter the Settlement

2

because she should not have been liable for any of the rental arrears after she was forced out of the apartment, she did not want to have to appear anymore in a court case where her abuser was a party.

Unfortunately Cherstev apparently had no intention, from the beginning, of honoring this Settlement. On March 3, 2020, the day before the Settlement, Cherstev filed, by and through Hertz, a Second Collection Lawsuit seeking the very same rental arrears as the First Collection Lawsuit. The Second Collection Lawsuit even relied on the same defective Rent Demand that claimed service on Ms. Savtchouk at the apartment that she had been forced to leave. Despite entry of the Settlement, the already improper Second Collection Lawsuit was continued by Hertz falsely claiming to have served Ms. Savtchouk with the Second Collection Lawsuit at the apartment which, by this time, she had not lived in for months and which now was recognized by the March 4, 2020 court-ordered settlement as not being her residence. Further, the Second Collection Lawsuit sought the entirety of the rental arrears due for the apartment from October 2019 onward rather than the Settlement's reservation of only $7,888.32 in rental arrears. Ms. Savtchouk would not learn of this Second Collection Lawsuit until collection letters beginning on or about Feburary 15, 2021 from another firm, Smith, alerted her to the fact that Cherstev was still trying to collect all of the rental arrears from her. When Ms. Savtchouk, through counsel, reached out to Hertz to have this improper lawsuit discontinued, Hertz falsely averred that it would discontinue the Second Collection Lawsuit. Instead, Hertz did nothing despite Ms. Savtchouk's counsel repeatedly following up with them demanding a dismissal. Ultimately it took Ms. Savtchouk filing, through counsel, a Motion to Dismiss in the Second Collection Lawsuit before Hertz would stipulate to discontinue the Second Collection Lawsuit on the terms of the Settlement.

Meanwhile, Cherstev had retained another collection law firm, Smith, which began to send collection letters to Ms. Savtchouk on or around February 15, 2021 alleging that she owed Cherstev $19,810.65 in rental arrears. Despite Ms. Savtchouk telling Smith over the phone her situation, Smith would not budge, and so Ms. Savtchouk sent Smith a request for validation of the debt. Smith responded with a false verification of the $19,810.65 debt, namely attaching an "Open Balance Report" which on its face showed the arrears owed by Shawn Powell, not Ms. Savtchouk. Even if Smith had not received the Settlement from Cherstev, entries in the Open Balance Report should have alerted Smith upon a meaningful attorney review that there had been court proceedings involving settlement that should be reviewed before "verifying" the debt. Smith either knew about the Settlement and falsely verified the debt anyways, or failed to perform even a minimal review that would have alerted Smith that it could not actually verify the $19,810.65 debt. Ms. Savtchouk's counsel subsequently demanded that Smith confirm that it would cease attempting to collect this debt that Ms. Savtchouk did not owe – as of this filing, Smith has not done so. Smith has disregarded settlements in its debt collection before, as shown by the allegations of two other FDCPA lawsuits against the firm, and upon information and belief it has a pattern and practice of disregarding settlements in its debt collection.

Already facing the distress and trauma of an abusive relationship and losing her housing, Ms. Savtchouk is now further plagued by anxieties about additional illegal court proceedings dragging her back into court and possibly into contact with her abuser Shawn Powell, who upon information and belief still resides at the subject apartment. She started going to therapy again due to these anxieties as well as going to a psychiatrist for treatment of depression, PTSD, and generalized anxiety.

**JURISDICTION AND VENUE**

4

1.      The Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because the dispute involves predominant issues of federal law under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et. sec.* (the "FDCPA").

2.      The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because they are so related to Plaintiff's claims within the Court's original jurisdiction as to form part of the same case or controversy under Article III of the United States Constitution.

3.      Venue is proper because all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Kings County, New York.

## **THE PARTIES**

4.      Plaintiff Kristina Savtchouk, formerly known as Kristina Powell prior to her divorce from Sean Powell ("Ms. Savtchouk") is an individual who resides in Kings County, New York.

5.      Ms. Savtchouk is a consumer as defined by 15 U.S.C. § 1692a(3) because she is alleged to owe a debt to Defendant Cherstev, arising from putative rental arrears for Ms. Savtchouk's former residence.  Plaintiff's alleged obligation is a "debt" as defined by 15 U.S.C. § 1692a(5) because it was incurred primarily for family, personal, or household purposes.

6.      Defendant Cherstev East Third, LLC ("Cherstev") is a limited liability company organized under the laws of the State of New York.  Cherstev engages in business in New York State and this suit arises out of Cherstev's business in New York State.

7.      Cherstev was the petitioner in both collection lawsuits against Ms. Savtchouk, and alleged in both of the lawsuits that it was the landlord of Ms. Savtchouk's former residence.

8.     Cheryl Borkowski is a managing member of Cherstev who, on information and belief, is a resident of New York.

9.     Ms. Borkowski's name is listed in the rent demands allegedly served on Ms. Savtchouk.

10.    Ms. Borkowski shares an email with Cherstev: sandrproperties@aol.com.

11.    Ms. Borkowski is also listed as the managing agent for Ms. Savtchouk's former residence in both of the collection lawsuits against her.

12.    Ms. Borkowski was personally involved in the deceptive conduct towards Ms. Savtchouk.

13.    Since Ms. Borkowski's actions were on behalf of Cherstev, the term "Cherstev" applies jointly and severally the Defendants Ms. Borkowski and Cherstev East Third, LLC.

14.     Defendant Hertz, Cherson & Rosenthal, P.C. ("Hertz") is a debt collection law firm organized under the laws of the State of New York. Hertz engages in business in New York State and this suit arises out of Hertz's business in New York State.

15.    Hertz's principal purpose is the collection of consumer debts alleged to be due to another, and it regularly does so.  Specifically, Hertz regularly collects or attempts to collect, directly or indirectly, rental arrear debts asserted to be due another by filing hundreds of collection lawsuits, collecting on putative judgments, and sending collection letters.

16.    Defendant Smith, Carroad, Levy, Wan & Parikh, P.C. ("Smith") is a debt collection law firm organized under the laws of the State of New York. Smith engages in business in New York State and this suit arises out of Smith's business in New York State.

17.    Smith's principal purpose is the collection of consumer debts alleged to be due to

another, and it regularly does so.  Specifically, Smith regularly collects or attempts to collect, directly or indirectly, rental arrear debts asserted to be due another by filing hundreds of collection lawsuits, collecting on putative judgments, and sending collection letters.

## STATEMENT OF FACTS

### *Domestic Violence Drives Ms. Savtchouk to Vacate the Residence*

18.     On or around August 15, 2011, Kristina Savtchouk moved into Apartment No. C5 located at 1463 East 3rd Street, Brooklyn, NY 11230 ("the Residence"), owned and management by Defendant Cherstev.

19.     Ms. Savtchouk was a good tenant, and continued to live in the apartment until 2019.

20.     On or around July 29, 2019, Ms. Savtchouk and Shawn Powell signed a lease renewal for the Residence, effectively putting Mr. Powell on the lease for the first time, which was emailed to Cherstev in September of 2019.

21.     Ms. Savtchouk and Mr. Powell had gotten married, but Mr. Powell became abusive towards Ms. Savtchouk in July of 2018.

22.     Like many abusers, Mr. Powell used the courts and criminal justice system against Ms. Savtchouk to control and hurt her.

23.     Mr. Powell obtained a Protective Order against Ms. Savtchouk under false pretenses on June 17, 2019. **Exhibit A** (First Order to Stay Away from Apartment).[2] This led to Ms. Savtchouk being arrested on September 24, 2019 and ordered to stay away from the Residence.

---

[2] All Exhibits attached to this complaint are incorporated by reference in their entirety.

24.    While this abuse of the legal system was eventually corrected by the Kings County District Attorney dismissing and sealing the vexatious criminal charges by Shawn Powell against Ms. Savtchouk, that would not be accomplished until January 8, 2020, and so Ms. Savtchouk was forced to vacate the Residence.

25.    The Order against Ms. Savtchouk only allowed her to retrieve her personal property from the residence. **Exhibit B** (Second Order to Stay Away from Apartment).

26.    Accordingly, on October 2, 2019, Ms. Savtchouk emailed Cherstev about the Order (which she attached) and the domestic violence, and that she would not be able to pay rent as well as needing to vacate the apartment. **Exhibit C** (Email to Landlord with Order).

27.    Ms. Savtchouk received no response to her October 2 email to Cherstev, so on October 8, 2019 she sent another email to Cherstev asking for confirmation that she is off the lease.

28.    Ms. Savtchouk was being put through hell by Mr. Powell, a nightmare of abuse and false accusations to cover up the abuse. And it was about to be made worse due to the greed of the Defendants.

### *Cherstev through Hertz files First Lawsuit against Ms. Savtchouk and Enters into a Settlement with Her*

29.    On January 2, 2020, Defendant Cherstev filed a collection lawsuit suit (the "First Lawsuit") against Mr. Powell and Ms. Savtchouk in Kings County Housing Court captioned claiming $2,627.44 for November and October of 2019 seeking to collect putative rent due. **Exhibit D** (First Collection Lawsuit).

30.    The First Lawsuit attached a Rent Demand Notice dated December 5, 2019, allegedly served on the Residence. **Exhibit E** (First Rent Demand). The Rent Demand bore the

typed signature "BY: CHERYL BORKOWSKI, MEMBER." *Id.*

31.    Cherstev knew that Ms. Savtchouk had been ordered to stay away from the Residence as of September 24, 2019, and that she was going to vacate the apartment. Nevertheless, Defendants still posted the Rent Demand Notice for both Shawn Powell and Ms. Savtchouk on the door of the apartment Cherstev knew Ms. Savtchouk did not reside in. **Exhibit F** (Affidavit of Service of First Rent Demand).

32.    Similarly, the First Lawsuit was also "served" on both Shawn Powell and Ms. Savtchouk by affixing it to the door of the apartment Cherstev knew Ms. Savtchouk did not reside in. **Exhibit G** (Affidavit of Service of First Collection Lawsuit).

33.    In other words, Chesterv actively concealed the Rent Demand Notice and First Lawsuit by affixing them to the door of the "residence" Cherstev knew Ms. Savtchouk did not reside in and was prohibited from visiting.

34.    Ms. Savtchouk only learned about the First Lawsuit against her when her now-former landlord, Cherstev, told her that Cherstev's lawyers had advised Cherstev to not talk to her anymore, which led her to suspect that they may have filed a lawsuit against her.

35.    Accordingly she went to the court on February 26, 2020 and learned, for the first time, that Cherstev had filed a lawsuit against her, and moreover falsely claimed to have served her with that lawsuit.

36.    Fortunately in October of 2019, Ms. Savtchouk had retained the assistance of the nonprofit Sanctuary for Families, a nonprofit providing support to people like Ms. Savtchouk experiencing and recovering from domestic violence. Initial she went to Sanctuary for Families for domestic violence counseling, but fortunately for her they also provide legal services for

survivors of domestic violence.

37.    On March 4, 2020, Ms. Savtchouk and her counsel from Sanctuary for Families appeared at a hearing for the Collection Lawsuit, where she entered into a Stipulation of Settlement with Cherstev. **Exhibit H** (Stipulation of Settlement).

38.    The Settlement stated in pertinent part:

"(2) Respondent Kristina Powell represents that she has vacated the Subject Premises and hereby surrenders all rights, titles + interests in the Subject Premises, subject to the Criminal Court Order dated 2/25/20 and any subsequent orders granting her access to the Subject Premises to obtain her belongings.

(3) Petitioner alleges $7,888.32 in rent owed through 3/31/20. Petitioner severs and reserves its claim for present action against Respondent Kristina Powell for all rent owed through 3/31/20 and Respondent Kristina Powell reserves all defenses to such claim. For the avoidance of doubt, Petitioner hereby releases Respondent Kristina Powell from any liability to pay rent or use and occupancy subsequent to today's date." *Id.*

39.    Shawn Powell did not appear at the hearing and the Settlement expressly reserves all claims for rental arrears against him.

40.    Ms. Savtchouk did not want to enter into the Settlement since she believed she should not be held liable for rental arrears after she had been ordered to vacate the apartment on September 24, 2019, which she had promptly notified Cherstev of.

41.    However, despite the strong merits of her case, her immediate priority was avoiding any circumstance which would put her in the same space as the man who had abused her, and she thought that was what the Settlement would do.

42.    While not entirely resolved, Ms. Savtchouk felt that she had been freed at least from any further liability for the rent of an apartment that her abuser had forced her out of.

43.    But Defendants would callously, and with reckless disregard for Ms. Savtchouk's

rights, ignore this unambiguous court-ordered Settlement and continue to go after Ms. Savtchouk for all of the rental arrears allegedly due on the Residence.

***Unbeknownst to Ms. Savtchouk, Defendants Filed a Second Lawsuit Seeking the Same Rental Arrears as the First Lawsuit.***

44.    On March 3, 2020, the day before Ms. Savtchouk entered into the Settlement in the First Lawsuit, Cherstev, by and through Hertz, filed another collection lawsuit (the "Second Lawsuit") against her and Shawn Powell, *Cherstev East Third v. Shawn Powell & Kristina Powell,* LT-056959-20/KI. **Exhibit I** (Second Collection Lawsuit).

45.    The Second Lawsuit sought the exact same rent from the Residence as the First, a total of $6,031.10 for the months of October 2019 through February 2020. *Id.*

46.    Like the First Lawsuit, Cheryl Borkowski was listed as the Agent for the Residence. *Id.*

47.    Most obviously, Defendants attached the exact same Rent Demand Notice dated December 5, 2019 that was attached to the First Collection Lawsuit. *Id.*

48.    This was the same Rent Demand Notice that Cherstev had affixed to the door of the apartment that it knew Ms. Savtchouk no longer lived in and was legally prohibited from visiting.

49.    However the use of the false affidavit of service for the Rent Demand Notice (**Exhibit E**) was even more egregious as used in the Second Collection Lawsuit because it was filed after Cherstev had entered into the Stipulation of Settlement (**Exhibit H**) that included in pertinent part "Respondent Kristina Powell represents that she has vacated the Subject Premises and hereby surrenders all rights, titles + interests in the Subject Premises."

50.    In other words, Cherstev continued to use the false affidavit of service for the

Rent Demand Notice despite recognizing in a Court-ordered Stipulation that Ms. Savtchouk had vacated the apartment and thus that affixing a Rent Demand Notice to the apartment door was not service on her residence.

51.    This Second Collection Lawsuit was *per se* deceptive for seeking to collect twice on the same rent as the First Collection Lawsuit.

52.    Defendants continued to litigate this illegal Second Collection Lawsuit by filing an affidavit of service claiming they attempted personal service on Ms. Savtchouk (at an address they knew she did not reside), in order to perform nail and mail service on the apartment that Ms. Savtchouk did not live in on March 10, 2020. **Exhibit J** (Affidavit of Service of Second Lawsuit).

53.    As with the service of the December 5, 2019 Rent Demand Notice and the First Collection Lawsuit, the Second Collection Lawsuit was served on the apartment despite Cherstev having known for several months that Ms. Savtchouk no longer lived there. Moreover, the Second Collection Lawsuit was served on the Residence less than a week after Hertz had entered into a Settlement with Ms. Savtchouk that recognized expressly that she did not live at the Residence.

54.    Defendants knowingly filed an affidavit of service to claim service on Ms. Savtchouk despite both Cherstev and Hertz knowing, and attesting to in a court-ordered Stipulation, that Ms. Savtchouk had vacated the premises and the apartment was not her residence.

55.    Defendants fraudulently concealed the existence of the Second Collection Lawsuit from Ms. Savtchouk by using the false affidavit of service to deceive the court into

believing that she had been given notice of the Second Collection Lawsuit when in fact Defendants gave no notice to Ms. Savtchouk about the Second Collection Lawsuit.

56.     Both Cherstev and Hertz were also on notice of the dangerous and traumatic circumstances that caused Ms. Savtchouk to vacate the premises, and knew or should have known the at-minimum anxiety and distress that it would cause. Defendants proceeded with the Second Collection Lawsuit with reckless disregard for how this could force Ms. Savtchouk to come into contact with her abuser.

57.     In fact, Ms. Savtchouk did not learn about this Second Lawsuit until she received a collection letter from Smith on or around March 2, 2021, which prompted her to call the courts on March 23, 2021 to determine if there were any lawsuits against her by Cherstev.

58.     Ms. Savtchouk had enter into the Stipulation of Settlement primarily to further limit any possible contact with Shawn Powell, so for the Second Collection Lawsuit to appear more than a year later and threaten to force her into such contact again was extremely distressing.

59.     On June 7, 2021, Ms. Savtchouk's attorney emailed Hertz and asked for confirmation that it would be discontinued. On June 14, 2021, Hertz responded stating that a discontinuance would be submitted for the Second Lawsuit.

60.     However, by July 19, Hertz had still not submitted a discontinuance for the Second Lawsuit, so Ms. Savtchouk's attorney demanded Hertz submit it by July 23, 2021.

61.     Because Hertz would not file a discontinuance despite its averment that it would do so, Ms. Savtchouk, by and through her attorneys, filed a Motion to Dismiss on September 24, 2021. **Exhibit K** (Motion to Dismiss).

62.     This finally got Hertz's attention, and almost 4 months after they said they would file a discontinuance and 19 months after the Settlement, Plaintiff and Defendants signed and filed a Stipulation of Discontinuance "per the terms of the March 4, 2020 stipulation." **Exhibit L** (Discontinuance for Second Lawsuit).

63.     In addition to the emotional distress caused by this Second Lawsuit hanging over Ms. Savtchouk's head from the date she discovered it on March 23, 2021 until it was discontinued on September 24, 2021, she also had to incur the postage costs for serving the Motion to Dismiss on Hertz.

### *Cherstev, by and through Smith, Attempts to Collect $19,810.65 from Ms. Savtchouk*

64.     On or around March 2, 2021, Ms. Savtchouk receives a Collection Letter dated February 15, 2021 from Smith seeking $19,810.65 on behalf of Cherstev. **Exhibit M** (February 15 Letter).

65.     The Letter first noticed that Smith had been retained "for legal collection," and instructed to "direct all communications regarding this matter to us and not to our client, the creditor." *Id.*

66.     On March 2, 2021, Ms. Savtchouk called Smith and attempted to explain to them the circumstances of the domestic violence she survived and the previous settlement with their client Cherstev.

67.     Smith claimed to have no idea who Shawn Powell was and told Ms. Savtchouk that her name was the only one that appeared on the lease and open balance reports they had received from Cherstev.

68.     On March 11, 2021, Ms. Savtchouk sent a letter to Smith demanding verification

of the debt, which Smith received on March 15, 2021. Ms. Savtchouk incurred the cost of postage sending this letter certified mail return receipt requested. **Exhibit N** (Verification Demand Letter).

69.     In addition to having informed Smith that she was a survivor of domestic violence over the phone, Ms. Savtchouk's Verification Demand Letter expressly cited to N.Y. Real Prop. Law § 227-c, which provides for the termination of residential leases by victims of domestic violence.

70.     On March 16, 2021, Smith sent a letter falsely purporting to verify the $19,810.65 alleged to be owed. **Exhibit O** (False Verification Letter).

71.     In addition to misrepresenting the amount owed, Smith attached the 2011 lease, the original rental application, Ms. Savtchouk's driver license, and an "Open Balance Report."

72.     Attaching the "Open Balance Report" was deceptive on its face – it only featured the name of Shawn Powell as owing the alleged rental arrears of $19,810.65.

73.     Either Smith sent the letter without performing a meaningful attorney review of the documentation, despite the signature of the attorney Pragna Parikh, Esq., or it did perform a meaningful review, saw the Open Balance Report solely concerned Shawn Powell, and nevertheless sent it to Ms. Savtchouk in an attempt to deceive her into believing she owed $19,810.65 in rental arrears.

74.     Even if Cherstev did not provide the Settlement to Smith, the Open Balance Report also had several entries showing the filing of a petition, court appearances, and settlement talks. If Smith had performed a meaningful review of this document that was allegedly verifying that Ms. Savtchouk owed $19,810.65, it should have at minimum suspected that there were

related court files it needed to review and accordingly requested those files from Cherstev or retrieved them from the courts.

75.     On May 18, 2021, Plaintiff's counsel emailed Pragna Parikh at Smith, providing notice of all of the above, and demanding that all proceedings for the rental arrears against Ms. Savtchouk be dismissed within 7 days and that Smith provide confirmation of the dismissal.

76.     On May 25, 2021, Plaintiff's counsel sent a letter by email and fax to Pragna Parikh at Smith, demanding that Cherstev and Smith provide written confirmation that (1) Ms. Savtchouk did not owe the money they had previously sought to collect from her or (2) the amount that Smith and Cherstev allege Ms. Savtchouk owes, and (3) Smith and Cherstev would not be taking any further action to collect on this alleged debt. **Exhibit P** (Second Demand to Cease Collection). The letter also provided notice of the Second Lawsuit and enclosed a stipulation of dismissal for it.

77.     That day, Pragna Parikh at Smith responded by email to confirm receipt of the letter by fax, and stated that "Someone will address it." As of the date of this filing, Smith has not provided confirmation that it and Cherstev would cease attempting to collect $19,810.65 from Ms. Savtchouk or in any other way responded to the Second Demand.

### *Defendants' Cross-Liability*

78.     As a preliminary matter, the FDCPA is a strict liability statute so the knowledge or intent of the debt collector is immaterial to FDCPA liability. Therefore, all defendants are liable for collecting on a non-existent judgment, either directly or through their agents. However, evidence of knowledge, both actual and charged, abounds.

79.     Cherstev actually knew, should have known, or was charged with knowing when

the Settlement was entered into and accordingly what rental arrears they could seek from Ms. Savtchouk going forward. Hertz, the attorneys of record for Cherstev, entered into the Settlement on Cherstev's behalf.  On information and belief, Hertz had authority to do so and informed Cherstev of the terms of the Settlement.

80.    Similarly, Cherstev actually knew, should have known, or was charged with knowing that the Second Lawsuit had been filed, by and through Hertz, and that Hertz filed an affidavit of service falsely claiming to have served with Ms. Savtchouk with the Second Lawsuit.

81.    If Cherstev represented to Smith that there was a debt of $19,810.65 against Ms. Savtchouk, Cherstev would be liable for the misrepresentations consequently made by Smith to Ms. Savtchouk concerning the debt.

82.    It appears none of the Defendants took even the most ministerial of steps to determine what amount of rental arrears was owed by Ms. Savtchouk.  Either the Defendants knew of the Settlement, and thus that Ms. Savtchouk did not owe $19,810.65, or they did not know about it due to their own reckless disregard for Ms. Savtchouk's rights.

### *Smith's Pattern and Practice of Disregarding Settlements in Its Debt Collection*

83.    Unfortunately Ms. Savtchouk is not the first vulnerable New Yorker targeted by Smith for deceptive debt collection.

84.    In *Cooper-Kinsler v. Smith, Carroad, Levy & Finkel, LLP,* Case 2:09-cv-01300-WFK-ETB (E.D.N.Y. Mar. 27, 2009), the disabled and low-income Plaintiff accrued a medical debt and entered into a stipulation with Smith to pay $50 each of month until the total sum of $2,215 was paid. **Exhibit Q** (Cooper-Kinsler Complaint).

85.    Despite fulfilling the terms of the settlement for months, Smith moved for a

default judgment against Ms. Cooper-Kinsler without providing her with the requisite 7 days notice that Smith and her had agreed to in the settlement.

86.    Smith also sent out Restraining Notices to the banks that Plaintiff had an account with, and accordingly they were restrained and Ms. Cooper-Kinsler was charged several hundred dollars in restraint and bounced check fees.

87.    This fact is crucial because it shows that Ms. Savtchouk's fear in the present matter that Smith would escalate beyond letters, despite seeking an amount more than $10,000 higher than the agreed Settlement, was not unreasonable.

88.    And like Ms. Savtchouk, Ms. Cooper-Kinsler was in an especially vulnerable time, going through breast cancer, and her explanation of this to Smith, like Ms. Savtchouk's explanation of Shawn Powell's abuse, did not deter Smith from continuing its deceptive and unfair debt collection.

89.    In *Brach, et al v. Smith, Carroad, Levy & Finkel, LLP,* No. 1:05-cv-05829-ILG-RER (E.D.N.Y.), Smith was collecting another medical debt, this time against Jack and Debby Brach. **Exhibit R** (*Brach* Complaint).

90.    Again, Smith and the Brachs entered into a settlement stipulation, which required monthly payments of $1,000 every month, which the Brachs did. Despite this, Smith refused to file a satisfaction of judgment, negatively effecting the Brachs' credit reports which continued to report an unsatisfied judgment.

91.    Upon information and belief, *Cooper-Kinsler* and *Brach*, along with the present case, are part of a pattern and practice of Smith to disregard settlement stipulations in their debt collection, whether intentionally or through a reckless disregard for consumers' rights.

*Damages*

92.     Ms. Savtchouk has suffered significant emotional distress, embarrassment, and humiliation as a result of the Defendants' multiple unlawful attempts to collect on rental arrears of $19,810.65 and more despite the March 4, 2020 Settlement where Cherstev only reserved the right to proceed against Ms. Savtchouk for $7,888.32 and expressly released Ms. Savtchouk from any liability to pay any other rent.

93.     Because Shawn Powell was also named as a respondent in the two collection lawsuits against her, Ms. Savtchouk's distress and trauma regarding the abuse she endured heightened the emotional distress caused by Defendants' unlawful debt collection.

94.     Ms. Savtchouk has had to resort to drastic measures to avoid Mr. Powell and stay safe, such as changing her car license plate after he stole her car keys.

95.     Because Mr. Powell abused the legal system to harm Ms. Savtchouk, and in particular had her arrested under false pretenses, Ms. Savtchouk is terrified every time she sees a police officer.

96.     Because of the financial impact of Mr. Powell's abuse, Ms. Savtchouk had to move in with her parents until she could get her finances in order.

97.     When Ms. Savtchouk received the first letter from Smith, her face was so distraught that it prompted her mother to ask her what had happened.

98.     Any time Ms. Savtchouk sees a letter from an attorney now she panics and her heart palpitates.

99.     When she received the collection letters from Smith, and later learned about the Second Lawsuit filed by Hertz, she thought to herself "What more do I have to go through?"

100.    Learning of the Second Collection Lawsuit, Ms. Savtchouk was extremely distressed by the prospect of being forced to come into contact with her abuser Shawn Powell.

101.    She had hoped that once she explained to Smith what the situation was with the abuse she faced and how she left the apartment long ago that they would not contact her again, a hope that was dashed once she received another letter from them.

102.    Ms. Savtchouk was afraid she would be held liable for a debt she did not owe. She has been so abused through the court system that she had no faith that the courts would not hurt her again.

103.    She could not understand why Defendants would still try to be collecting all of the rental arrears for the apartment from her when it had been settled on March 4, 2020. Ms. Savtchouk was scared that Mr. Powell had told them go after her and that he was once again using the courts to go after her.

104.    Mr. Powell always seemed to get away with it, so it seemed possible to Ms. Savtchouk that he was now getting away with not paying the rent by having the Defendants go after her for it.

105.    She was afraid she would have to return to court regarding these debt collection attempts, and when she goes to court she has anxiety attacks, knots in her stomach and throat, and she feels like she's going to pass out.

106.    Having to go to court for a debt not owed is distressful by itself, but when coupled with the prospect of coming into contact with her abuser or having to recount again the traumatic circumstances for why she was forced to vacate the apartment, the distress was debilitating.

107.    When the New York courts began re-opening from their COVID-19 restrictions, it

increased her anxiety about both the collection letters she had received and the Second Lawsuit that had been filed against her.

108.    Ms. Savtchouk was in therapy in October 2019 but stopped the following year because of the cost, and only was able to start seeing a therapist again in July 2021.

109.    However, when Ms. Savtchouk recently started therapy again, it was due to panic attacks about being afraid of being served with more court papers and anxiously checking eCourts to see if there were any additional proceedings against her.

110.    In August 2021 she started seeing a psychiatrist, who diagnosed her with depression, PTSD, and generalized anxiety.

## CLAIMS

### FIRST COUNT

**Violations of the Fair Debt Collection Practices Act (as to Attorney Defendants)**

111.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

112.    The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e); see also *Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

113.    Congress designed the FDCPA to be enforced primarily through private parties – such as plaintiff – acting as "private attorneys general." *See* S. Rep. No. 382, 95th Con., 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.,* 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

114.    The obligation alleged to be owed by Plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the rental arrears were incurred for a residential apartment.

115.    Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt" as defined by 15 U.S.C. § 1692a(5).

116.    For the reasons set forth in the "Parties" section of this Complaint, each Attorney Defendant is a "debt collector" as defined in 15 U.S.C. § 1692a(6).

117.    Defendants violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f.  By way of example and not limitation, Defendants violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the compensation which may be lawfully received; threatening to take and actually taking an action prohibited by law, or threatening to take an act not intended to be taken; communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed; using any false

representations or deceptive means; using unfair or unconscionable means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

118.    As a direct and proximate result of Attorney Defendants' violations, Plaintiff has suffered damages, including, *inter alia*, significant emotional distress, embarrassment, and humiliation.

119.    The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

120.    Ms. Savtchouk suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to out of pocket expenses for making copies, for postage, and for medication.

121.    Ms. Savtchouk's injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, and abuse of process.

122.    Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

## SECOND COUNT

## Deceptive Acts or Practices in Violation of New York General Business Law § 349 (as to all Defendants)

123.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

124.    New York General Business Law § 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state."  An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. § 349(h).

125.    As enumerated above, Defendants violated N.Y. Gen. Bus. § 349 *et seq.* by using deceptive acts and practices in the conduct of their businesses. These acts were done by Defendants systematically and, as such, have had a broad impact on consumers at large.

126.    Defendants committed the above described acts willfully and/or knowingly.

127.    Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiff and unless enjoined will cause further irreparable injury.

128.    As a direct and proximate result of those violations of N.Y. Gen. Bus. § 349 *et seq,* Plaintiff has suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, exemplary, and damages, together with costs and attorney's fees

129.    Defendants falsely, deceptively, and misleadingly represented to Ms. Savtchouk that they had the right to seek rental arrears from her in the amount of $19,810.65 or more after the Settlement had expressly limited her liability for rental arrears to, at most, $7,888.32.

130.    Defendant Smith sought to collect $19,810.65 without performing any meaningful attorney review.  Yet they falsely, deceptively, and misleadingly represented implicitly that they

had, in fact, conducted such a review, by sending Ms. Savtchouk a letter on attorney letterhead, signed by an attorney, with an "Open Balance Report" showing a balance of $19,810.65.

131.    The Defendants' deceptive conduct towards Ms. Savtchouk is the type of conduct that has a broad impact on consumers at large.

132.    Defendants knew or should have known—based on publically available Internet records, information in the court file, and Ms. Savtchouk's written dispute—that they were attempting to collect on a judgment that had been vacated and an underlying lawsuit that had been discontinued.

133.    That the relevant steps may be taken in a matter of minutes shows a high degree of moral culpability.  Defendants' violations were willful and knowing, or, at minimum, evidence a conscious and reckless disregard for basic fairness and for the law. Defendants' wrongful and deceptive acts caused injury and damages to Plaintiff.

134.    As a direct and proximate result of Defendants' violations, Plaintiff has suffered damages, including, *inter alia*, significant emotional distress, embarrassment, and humiliation.

135.    The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

136.    Ms. Savtchouk suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to out of pocket expenses for making copies, for postage, and for medication.

137.    Ms. Savtchouk's injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, and abuse of process.

138.    Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

### THIRD COUNT

### Gross Negligence (as to all Defendants)

139.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

140.    Defendants' failure to exercise even slight care or diligence amounts to gross negligence.

141.    Moreover, had Defendants exercised even slight diligence they would have known their conduct was unlawful.

142.    Defendants' actions evince a reckless disregard for the rights of Ms. Savtchouk and others. The actions have the appearance of intentional wrongdoing. Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

143.    Defendants' conduct demonstrates a high degree of moral culpability and willful or wanton negligence or recklessness. As a result, Ms. Savtchouk is entitled to a punitive damage award.

### JURY DEMAND

144.    Please take notice that Plaintiff demands a trial by jury.


### PRAYER FOR RELIEF

145.    Wherefore, Plaintiff requests the following relief:

a. A declaration that Defendants have committed the violations of law alleged in this action;

b. An order enjoining and directing Defendants to cease violating the FDCPA, 15 U.S.C. § 1692, *et sec.*, and New York G.B.L. § 349;

c. Actual damages

d. Punitive damages;

e. Statutory damages under 15 U.S.C. § 1692k and G.B.L. § 349;

f. An order awarding disbursements, costs, and attorney fees under 15 U.S.C. § 1692k and G.B.L. § 349;

g. Pre-judgment and post-judgment interest as permitted by law;

h. All other and further relief that the Court deems just and proper.

Dated: February 4, 2022

/s/
_____

Ahmad Keshavarz,
The Law Office of Ahmad Keshavarz
16 Court St., 26th Floor
Brooklyn, NY 11241
Tel: (718) 522-7900
Fax: (877) 496-7809
Email:
ahmad@NewYorkConsumerAttorney.com